UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

In re:                                                                                                    Case Number: 05-13793-7

CHARLENE I. VANGEN,

       Debtor.

---

MEMORANDUM OPINION, FINDINGS OF FACT,
AND
CONCLUSIONS OF LAW

When the debtor filed bankruptcy, she listed several retirement accounts and annuities among her assets. She also claimed these accounts as exempt on her Schedule C. Both the chapter 7 trustee and a creditor, Larry Vangen, have objected to the debtor's exemption claims and contend that the exemption should be denied, at least in part, because the debtor engaged in impermissible pre-bankruptcy planning and converted nonexempt assets into the assets now claimed as exempt. This case poses intriguing questions regarding the issue of "exemption planning." It also represents the truth of the old saw that divorce is never final, as it has its genesis in the dissolution of the debtor's marriage some twelve years ago.

The debtor was married to the creditor, Larry Vangen. They were divorced in 1993. At the time of the divorce, Larry Vangen was a named defendant in litigation relating to Hawkins, Ash, Baptie & Co., the accounting firm in which he is a partner. The principal allegation in that state court lawsuit, styled <u>Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co., et al.</u>, was that HABCO and its partners conspired to utilize the plaintiff's

software without compensation in the licensing of turnkey computer operations, and the plaintiff sought a significant amount of damages. As the divorce court recognized, were liability to be assessed against HABCO in the litigation, that obligation would pass through to the individual partners as well. In the context of dividing the parties' assets and liabilities, the court found the lawsuit to be "a difficult issue" for both parties. In its August 10, 1993, findings of fact, conclusions of law, and judgment of divorce, the court stated:

> As the court understands the lawsuit, there are allegations that the partnership made a substantial amount of money from breaching a contract. Obviously, the respondent was one of the people who benefitted by having an increased income from that breach. The petitioner [Charlene Vangen, the debtor in this case] also benefitted from that additional income. If she was the beneficiary of income that the parties should not have received because it came from a contract that was breached, then she should bear the detriment if there is one. If the respondent was a plaintiff in a lawsuit and was perhaps to receive or be the beneficiary of a $5 million verdict in his favor, the Court suspects that the petitioner would certainly assert that she was entitled to a portion of that money since it accrued during the course of the marriage. The fact that this lawsuit is a liability rather than an asset does not change the legal reasoning, particularly because it appears that the amount that is going to be paid or may be paid to settle the lawsuit is based on the amount of income that the respondent in fact received during that period of time. There is certainly a direct connection.

Consequently, the divorce court therefore determined that the debtor was "responsible for one-half of whatever liability the respondent has." The lawsuit, however, was not resolved by way of a settlement as contemplated by the divorce court. Instead, it went to trial, and the jury found in favor of the plaintiff. The awards were indeed substantial, including a significant amount of punitive damages which were not directly related to the "amount of income that the respondent in fact received during that period of time." The HABCO defendants appealed the judgment, which wound its way through the state court

appellate system, but ultimately HABCO and its partners were obligated to pay a sizeable judgment. Larry Vangen's share of the obligation amounted to approximately $800,000; pursuant to the divorce decree, the debtor was responsible for one-half of this debt, or approximately $400,000.

The debtor subsequently asked the divorce court to reconsider its earlier order, which the court refused to do. In November of 2004, the divorce court determined that the original divorce decree would be enforced and that the debtor was still responsible for one-half of Larry Vangen's total litigation-related liability, even though it would appear difficult to conclude that the resulting obligation was in fact casually connected to the "increased income" the debtor purportedly received during the marriage.[1]

Shortly after the hearing before the divorce court, the debtor began consulting with attorneys regarding her options, bankruptcy among them. The debtor mortgaged her home (which had a small lien against it at the time) and sold an interest in a building leased to HABCO. She placed the $136,000 she received as a result in retirement-related annuities and filed bankruptcy. In her bankruptcy schedules, she claimed these retirement funds as exempt under Wis. Stat. § 815.18(3)(j). This section provides that debtors may claim as exempt assets which are held under "any retirement, pension, disability, death benefit, stock bonus, profit sharing plan, annuity, individual retirement account, individual retirement annuity, Keogh, 401-K or similar plan. . . ." All that is required for an annuity to be exempt under this section is that it qualify for tax-deferred status under the Federal Internal Revenue Code. In

---

[1] Indeed, to the extent that Larry Vangen's $800,000 judgment debt included punitive damages, such damages do not necessarily reflect the amount of income Vangen "actually received" as a result of any breach.

re Bruski, 226 B.R. 422, 425 (Bankr. W.D. Wis. 1998). And unlike the federal exemption found in 11 U.S.C. § 522(d)(10), the Wisconsin exemption for such annuities places no restriction on the amount claimed as exempt. Id.

Larry Vangen and the bankruptcy trustee both objected to her exemption claims. They contend that her "pre-bankruptcy planning" justifies denial of the exemption under Wis. Stat. § 815.18(10), which provides that an exemption may be denied where the asset in question was procured, concealed, or transferred with the intention of defrauding creditors.[2] The debtor concedes that she purchased the annuities while considering whether to file bankruptcy. However, she denies that she engaged in any behavior which could be considered fraudulent, and contends that her principal concern was her retirement, especially since she was worried about the viability of any payout under her husband's retirement plan.

The objection to the debtor's exemption is premised upon a few basic facts. First of all, in November of 2004, the debtor's home was worth approximately $200,000; the only lien against her homestead was a first mortgage in the amount of $35,800. She also owned a fractional interest in the building which was leased to HABCO. She consulted with attorneys, after which she refinanced the mortgage on her homestead and received some $130,000. She paid off the first mortgage on her home, paid a few other creditors, and then invested the balance in the AXA Equitable annuity listed on her schedules. A few weeks before she filed bankruptcy, the debtor sold her interest in the HABCO building to her son for the sum

---

[2] The section specifically provides that "[a]ny or all of the exemptions granted by this section may be denied if, in the discretion of the court having jurisdiction, the debtor procured, concealed, or transferred assets with the intention of defrauding creditors."

4

of $60,000. Again, she paid a few other bills from the proceeds and then invested the balance in the AXA annuity.

The creditor complains that the debtor "drained" the nonexempt equity from her assets in anticipation of bankruptcy. In that regard, bankruptcy relief is intended to afford the "honest but unfortunate" debtor with the proverbial "fresh start." See Grogan v. Garner, 498 U.S. 279, 286, 111 S. Ct. 654, 659, 112 L. Ed. 2d 755 (1991). Part of that fresh start is the notion that a debtor may retain certain assets in order to begin a new financial life. However, the law also recognizes that there is a point at which the fresh start becomes an impermissible "head start." The question before the Court is whether the debtor has crossed the line into that forbidden territory.

During the trial in this matter, the debtor essentially acknowledged that both the equity in her home and the interest in the HABCO building would not have been exempt assets. The debtor stated that she had purchased the annuity for retirement purposes. The creditor and the trustee contend that she did so with the anticipation of filing bankruptcy and point to the fact that, during testimony, the debtor conceded that the specific annuity in question was purchased with the expectation that it could be claimed as exempt.

So-called "exemption planning" exists within something of a legal "gray area" in which competing interests conspire to blur the border between the acceptable and the impermissible. Despite the recognition that certain conduct may constitute fraud or be regarded as unreasonable, the law permits debtors to take advantage of the exemptions available to them. Indeed, debtors are to be permitted the "full use" of the available exemptions and will not be penalized for ordering their affairs in such a manner as to take

5

best advantage of the exemptions legally afforded to them. In re Smiley, 864 F.2d 562, 567 (7th Cir. 1989); see also Bruski, 226 B.R. at 425. As Judge Learned Hand stated in a similar context, "[T]here is nothing sinister in so arranging one's affairs as to keep taxes as low as possible." Commissioner v. Newman, 159 F.2d 848, 850-51 (2d Cir. 1947).

In Smiley, the Seventh Circuit wrestled with the issue of exemption planning in the context of the debtor's discharge, and concluded that the conversion of assets from nonexempt to exempt within the year preceding bankruptcy was not automatically fraudulent to creditors. Instead, the court stated that in order to find fraudulent intent, a court must look to "extrinsic signs of fraud," including:

1. Whether the debtor obtained credit in order to purchase exempt property;

2. Whether the conversion occurred after the entry of a large judgment against the debtor;

3. Whether the debtor had engaged in a pattern of "sharp dealing" prior to the bankruptcy; and

4. Whether the conversion rendered the debtor insolvent.

See Smiley, 864 F.2d at 567.

In the case of In re Bogue, 240 B.R. 742 (Bankr. E.D. Wis. 1999), the court examined a number of factors when considering whether a debtor's conversion of assets from nonexempt to exempt ran afoul of the prohibition found in Wis. Stat. § 815.18(10). Among them were the amount of the exemption, the proximity of the time of conversion to the time of filing bankruptcy, the source of the funds, whether the debtor misled creditors during the

conversion process, the purpose of the conversion, and whether the conveyances were for less than fair consideration. Id. at 750-51.

To creditors, it is unlikely that any conversion of nonexempt assets into exempt ones would be considered "fair" or "just." But the bankruptcy code contemplates that the simple practice of taking advantage of exemption laws is not fraudulent per se; there must be additional, or "extrinsic," evidence of fraud.[3] State law reflects a similar perspective. For example, in the case of Paulman v. Pemberton (In re Paulman), 246 Wis. 2d 909, 633 N.W.2d 715 (Wis. App. 2001), the Wisconsin Court of Appeals noted that while the state's homestead exemption is to be "liberally construed," the exemption did not apply to instances where the exemption had been acquired by "conversion, theft, or other wrongful appropriation." In that case, the defendant had purchased a home with funds he conceded had been converted not from his own nonexempt assets but instead from his mother's property; consequently, the exemption was inapplicable. Id., 633 N.W.2d at 719-20.

While Paulman was not decided under Wis. Stat. § 815.18(10), it is nonetheless illustrative of the fact that it is not the acquisition of exempt property which is the principal component of the court's inquiry, but rather the surrounding circumstances. There must be

---

[3] For example, the report of the House Judiciary Committee on the Bankruptcy Code of 1978 indicates:

> As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. See Hearings, Pt. III, at 1355-58. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

H.R. Rep. No. 595, 95th Cong., 2d Sess. 361, reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6317.

some demonstrable behavior which triggers the notion that the debtor has "procured, concealed, or transferred assets with the intention of defrauding creditors." This is a fact-intensive inquiry which must rest upon an examination of the particular case. In that regard, the Eighth Circuit's companion cases of In re Johnson, 880 F.2d 78 (8th Cir. 1989), and Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871 (8th Cir. 1988), are quite instructive.

Johnson and Tveten, the debtors in the respective cases, were partners in certain real estate developments which were highly leveraged and ultimately failed. When the developments failed, Tveten became liable for over $19 million, which was far more than he was able to pay. Johnson likewise became responsible for a portion of the debt. Both began converting nonexempt assets into exempt assets. Tveten liquidated virtually all of his nonexempt assets and converted some $700,000 into life insurance or annuity contracts. Johnson converted some $400,000 into exempt property, including his homestead and annuities and individual retirement accounts. In Johnson's case, the appellate court agreed that there was no fraud as to the homestead exemption but remanded for further proceedings regarding some of the other exemptions.[4] In Tveten's case, the court affirmed the denial of his discharge.

Importantly, however, the court made a number of statements which are relevant to the present inquiry. For example, in Johnson the court stated that "we remind the lower

---

[4] Johnson's discharge was subsequently denied on remand. See In re Johnson, 124 B.R. 290 (Bankr. D. Minn. 1991). The court made a number of very specific factual findings regarding the debtor's "actual intent" and concluded that the debtor intended to defraud creditors. Among the findings were the fact that the debtor had cashed his life insurance policies immediately after the bankruptcy filing, and that various exempt musical instruments (including a harpsichord and a piano) purchased with nonexempt funds could not be played by the debtor and were either stored in his basement or at another location.

courts that there is nothing fraudulent per se about making even significant use of other legal exemptions. Ultimately, fixed dollar limits on the use of exemptions must be set by legislatures." Johnson, 880 F.2d at 83. Likewise, in Tveten, the court stated that the debtor should not be penalized for merely doing that which the law allows him to do, and reaffirmed the idea that there must be "some facts or circumstances which are extrinsic to the mere facts of conversion of nonexempt assets into exempt." Tveten, 848 F.2d at 875.

While Johnson and Tveten involved the issue of whether excessive exemption planning could result in the denial of a debtor's discharge, the case of Hanson v. First Nat'l Bank, 848 F.2d 866 (8th Cir. 1988), presented the court with an objection to the exemptions the debtors claimed under state law. In that case, immediately prior to filing bankruptcy the debtors consulted an attorney. On advice of counsel, the debtors sold their nonexempt property, including a car, two vans, and a motor home, to their son for fair market value (as determined by an independent appraisal). They used the proceeds of those sales to purchase life insurance policies, which they subsequently claimed as exempt. A creditor objected to the exemption claims, contending that the conversion of nonexempt assets to exempt assets on the eve of bankruptcy demonstrated fraudulent intent and justified the denial of the exemptions.

The court disagreed and permitted the debtors to claim the exemptions. In doing so, it reaffirmed the fundamental notion that

> [A] debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy for the express purpose of placing that property beyond the reach of creditors, without more, will not deprive the debtor of the exemption to which he otherwise would be entitled.

9

Id. at 868. The only exception to this principle is where the debtor acts with "actual intent" to defraud creditors; if such intent is proven, the exemption may be denied. Id. Absent extrinsic evidence of fraud, however, the conversion of nonexempt assets into exempt assets will not by itself be regarded as evidence of fraudulent intent. Id. It is important to understand this basic principle in the context of this case, as it largely determines the outcome.

As this Court noted in Bruski, and as the Eighth Circuit noted in Johnson, the establishment of monetary limits on exemptions is largely the province of the legislature, not the judiciary. At the same time, the Court recognizes the notion that there is a distinction between a fresh start and a "head start," and the colloquial characterization that in the context of exemption planning, "when a pig becomes a hog it is slaughtered." See In re Zouhar, 10 B.R. 154, 157 (Bankr. D. N.M. 1981). As evidence that the debtor has gone too far in her exemption planning, the creditor and the trustee point to the fact that she has sought to exempt considerably more than the debtors in Bruski and Bogue. But the Wisconsin exemption has no standard for limiting an annuity to a judicially determined "reasonable amount," even though such provisions can be found elsewhere in the Wisconsin exemption statutes (for example, in the exemptions afforded life insurance claims, personal injury claims, and wrongful death claims).

Consequently, the issue in this case is whether there is "extrinsic evidence" that the debtor "procured, concealed, or transferred assets with the intention of defrauding creditors." Considering the non-exclusive list of factors mentioned by the court in Bogue, it is true that the exemption here involves more than has been claimed exempt in some prior

cases.[5] At the same time, $136,000 is not a particularly sizeable sum when one considers that it may well serve as the debtor's principal source of retirement income.[6] Admittedly, the debtor funded the annuities in question in anticipation of filing bankruptcy. But that fact is of minimal importance since there must be evidence <u>beyond</u> the mere conversion of nonexempt property into exempt assets, whether in anticipation of bankruptcy or not.

As for the source of the funds, there is no basis for considering the money the debtor used to fund the annuities to have been "tainted" in any way. Unlike the defendant in <u>Paulman</u>, for example, there was no evidence that the debtor obtained the funds through conversion, theft, or wrongful appropriation. In <u>Hanson</u>, the court noted an extrinsic example of fraudulent intent might be an instance in which the debtor had "obtain[ed] goods on credit, [sold] them, and then place[d] the money into exempt property." 848 F.2d at 869. Here, while the debtor admittedly mortgaged her homestead to fund the annuity, in doing so she simply converted an asset she already owned (*i.e.*, the equity in her home) into an exempt asset. That is hardly an example of the sort of fraudulent intent contemplated by <u>Hanson</u> and similar cases.

Likewise, there is no evidence that she sold her interest in the HABCO building for anything other than fair market value. The debtor simply sold an asset at a fair price and used the money to take advantage of an exemption afforded her by Wisconsin law. That is

---

[5] For example, in <u>Bogue</u> the debtor sought to exempt $17,800, while the debtors in <u>Bruski</u> claimed $16,000 as exempt.

[6] There was testimony regarding the debtor's concerns about the stability of Larry Vangen's retirement, which would be largely based on a payout from HABCO which would require funding from future operations. The debtor was concerned that the business might not be able to sustain these payments.

11

not evidence, extrinsic or otherwise, of fraudulent intent. The creditor also complains that the debtor somehow "misled" him while she established and funded the annuities. This seems somewhat disinguous, as the debtor has always maintained that she was incapable of paying the debt. Further, she testified that while there may have been discussions about mediation, she subsequently learned that there would be little, if any, opportunity to significantly reduce the amount of her liability. As such, she saw little reason to proceed with those discussions and opted to file bankruptcy. There is no evidence that she made any misrepresentations to the creditor, or that he was in any manner forestalled or agreed to forbear in any collection efforts as a result of any misrepresentations.

The debtor may well have sought to place assets beyond the reach of the creditor, but her motivation in doing so was to create a retirement fund for her future. In that regard, the amount involved is certainly not exorbitant, as it will undoubtedly only provide her with a relatively modest income. None of her actions evidence any particular fraudulent intent. Instead, it was simply part of what the debtor obviously hoped would be the final chapter in a divorce-related controversy that has festered for twelve years. Based on the evidence presented at trial, the Court cannot conclude that the trustee and the creditor have presented sufficient "extrinsic" evidence of fraud to overcome the general perspective that the debtor is entitled to arrange her affairs in such a manner as to take full advantage of the exemptions available to her under state law. The objection to her exemption is denied.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

Dated:  November 23, 2005

BY THE COURT:

/s/ Thomas S. Utschig

Hon. Thomas S. Utschig
U.S. Bankruptcy Judge